FILED

2016 Dec-15  PM 01:04
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *ex rel.* ANITA C. SALTERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 5:10-cv-2843-LSC |
| | ) | |
| AMERICAN FAMILY CARE, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OF OPINION

## I.    Introduction

Plaintiff/Relator Anita C. Salters ("Relator") filed this action against her former employer American Family Care ("AFC") alleging that AFC violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, by submitting false claims to the government, and that it engaged in physician referrals in violation of the Stark Law, 42 U.S.C. § 1395nn.  She further alleges that she was unlawfully terminated in retaliation for reporting these potential violations to her superiors contrary to the FCA's anti-retaliation provision. 31 U.S.C. § 3730(h).  Before the Court is defendant AFC's motion for partial summary judgment (Doc. 92), which has been fully briefed and is

ripe for review.  For the reasons set out below, AFC's motion is due to be denied.

## II.   Background

### A. Relator's Management Style

AFC, a medical care provider, hired Relator as an audit supervisor in January 2007 and promoted her to director of the Claims Processing Center ("CPC") in December 2007. (Salters Dep. at 14, Kerr Dep. at 103.) With this promotion, she received a $10,000 raise and reported directly to Joseph Hawley ("Hawley"), AFC's Chief Financial Officer. (Salters Dep. at 146.)  Her duties as director of the CPC included: ensuring that the claims submitted were in compliance with all applicable regulations, collecting all sums due to AFC within a reasonable period of time, and supervising approximately twenty-five other employees in the CPC. (Salters Dep. at 190, Johansen Dep. at 37 & 72, Hawley Dec. ¶ 5.) Three subordinate supervisors reported directly to Relator: Donna Crocker ("Crocker"), Valencia McAdory Pickens ("Pickens"), and Patricia Allen ("Allen"). (Salters Dep. at 128.).

Before July 2010, Relator had only one disciplinary memorandum in her file and it was unrelated to this case. (Kerr Dep. at 116.) Relator was paid quarterly bonuses in 2008 and 2009 but not in 2010. (Hawley Dec. ¶

4.) However, according to AFC's Director of Human Resources James Kerr ("Kerr"), in February 2010 he created a Word document listing concerns about Relator's management style which he developed from "informal conversations with employees within CPC" and his own observations. (Kerr Dep. at 48-56.) Kerr further claims that he shared this document with Hawley after creating it. The document included concerns about other employees "becom[ing] targets for retaliation," requiring co-workers to "do her bidding" by making her coffee and getting her lunch, bad workload distribution, inaccurate communications, unprofessional behavior like playing favorites and intercepting emails, inappropriate dress and speech, hypocrisy and lack of credibility, punishing others for infractions that she committed herself, and capriciousness about working hours.  (Pl. Ex. 48.) The document, however, only bears a handwritten date, though Kerr claims that the date of creation is available in its native format and that the metadata will show that it was created in February 2010.[1] (Kerr Dep. 49-53.)

---

[1] Neither party has provided any evidence of this metadata. Relator does not dispute the dates of these documents directly, but does claim that she did not have meetings about her conduct until after May 2010, and also alleges that AFC fabricated a history of disciplinary problems in order to terminate her with impunity after she engaged in protected activity.

AFC also supports Relator's alleged management problems through depositions and declarations of those she supervised. For example, Crocker and Pickens claim that Relator punished her staff for breaking rules but then broke them herself with impunity. (Crocker Dec. ¶ 6, Pickens Dec. ¶ 12.) Staff members Erica Jackson and Evelyn Roper echoed these complaints and also state that Relator required her staff to work ten to thirteen hour days but then took long vacations and was often absent. (Jackson Dec. ¶ 10, Roper Dec. ¶ 9.) Tara Walton Person repeated the same complaints, and also stated that Relator did not allow personal emails, but then circulated her own non-work emails. (Person Dec. ¶ 8.) According to Allen, she forbade personal conversations but then had lengthy non-work conversations with employees in her office, "made rude, unprofessional and false comments about [Allen] to [Allen's] subordinates," and "treat[ed] employees in a manner that was completely uncalled for and without regard for professional decorum." (Allen Dec. ¶ 5 & 12.)

Pickens describes how Relator would make one of the oldest CPC employees get lunch for her every day. (Pickens Dec. ¶ 6.) Further, Relator does not dispute that she told Pickens, who is African-American, to "kiss her white ass." (Pickens Dep. at 125, Doc. 96 at 12.) According to

Pickens, this comment was made twice, and both times it was said in front of co-workers. (*Id.* at 124-28.) However, Pickens also admits that she never reported this comment, and laughed it off at the moment because "if [Pickens] had went to the other way, it wouldn't have been good." (*Id.* at 127-28.)

According to various employees, Relator was a liar and "a micromanager [who] did not train, encourage or empower" them and "left employees with confused expectations and the work environment unpredictable." (Allen Dec. ¶ 6, Howard Dec. ¶ 6, Person Dec. ¶ 6, Pickens Dec. ¶ 5, Roper Dec. ¶ 7.) These employees also stated that they did not complain or report these incidents of misconduct because Relator "engaged in threats, intimidation and retaliation . . . [and] sa[id] that if she was 'going down' (getting fired) that we would go down with her." (Howard Dec. ¶ 5 & 6, Jackson Dec. ¶ 5, Nelson Dec. ¶ 5 & 8, Allen Dec. ¶ 8, Pickens Dep. at 125-128.) Other employees averred that fears of retaliation were "real, as [they] witnessed [Relator] retaliate against other employees for what would be considered minor slights." (Crocker Dec. ¶ 7, Woodfin Dec. ¶ 6, Howard Dec. ¶ 7, Jackson Dec. ¶ 8.)

Six employees assert that Relator's management problems were "a cause of great stress and a problem for the entire department." (Allen

Dec. ¶ 5, Crocker Dec. ¶ 4, Howard Dec. ¶ 4, Jackson Dec. ¶ 4, Nelson Dec. ¶ 4, Pickens Dec. ¶ 4.) One employee complained that she "felt like [she] was tortured by" Relator, who would "harass [her], write [her] up without cause . . . [and] announce[] in front of [her] and others that she was going to fire [her]." (Jackson Dec. ¶ 8.) Another claimed that she "believe[d] she was falsely accusing [her] of things in order to build a fictitious personnel record to justify terminating" her. (Howard Dec. ¶ 7.) A supervisor professed that Relator's "unprofessional manner . . . made [them] and other employees uncomfortable." (Crocker Dec. ¶ 5.) Some staff members also contend that the situation impacted their health. (Howard Dec. ¶ 11, Jackson Dec. ¶ 11, Westwood Dep. at 81-82.)

As discussed further hereinafter, Relator engaged in protected activity by reporting alleged Stark Law violations in March 2010. On May 11, 2010, Hawley met with Relator, and the meeting agenda listed "management style" among other discussion topics. (Pl. Ex. 75.) Kerr claims that in May 2010, he was still receiving unsolicited complaints from CPC employees about Relator, which he recorded in another Word document. (Kerr Dep. at 67.) Once again, this document only has a handwritten date, but Kerr claims that the date can be established from

the metadata.[2] (*Id.* at 67-68, Pl. Ex. 51.) The complaints in this list are consistent with those in the earlier Word document, but are purportedly from different employees, namely Sylvia Cook, Robin Johnson, and Hope Harman. (Pl. Ex. 51.)

Relator took a vacation in early June 2010. Hawley and Kerr claim that Kerr gave Hawley a memo about the problems with Relator around June 11, 2010. (Hawley Dec. ¶ 9, Kerr Dep. at 118-121.) The memo identified the problems discussed above, and offered Relator continued employment with AFC if she took a demotion and improved her performance. (Pl. Ex. 64). This memo was addressed to Relator, and Kerr suggested that Hawley deliver it to her, but Hawley rejected this suggestion because he "wanted to sit down with her and talk about the issues identified." (*Id.*, Hawley Dec. ¶ 9, Hawley Dep. at 91.) However, Hawley claims that he did not meet with Relator immediately because of "pressing business matters and vacation schedules." (Hawley Dec. ¶ 12.) Kerr also claims that AFC conducted an "employee engagement survey," which "afforded [employees] an opportunity to comment about their manager." (Kerr Dep. at 125-26.) Relator admits that she knew about and participated in the survey. (Salters Dep. at 153-54.) This survey was

---

[2] *See supra* n.1.

online and anonymous, and, according to Kerr, unrelated to the problems AFC was having with Relator. (*Id.* at 125-28.) In this survey, CPC employees complained of Relator's favoritism, inconsistent rules, bad morale, lack of confidentiality, micromanagement, lack of responsibility, retaliation and unprofessionalism. (Pl. Ex. 65.)

After this survey was completed, AFC claims that Jackson called AFC owner Bruce Irwin ("Irwin") to complain about Relator. (Kerr Dep. at 73-74, Hawley Dep. at 97, Jackson Dec. ¶ 13.) Apparently as a result of this call, Kerr, Hawley, and Chief Operating Officer Randy Johansen ("Johansen") conducted an investigation by interviewing three women who worked in different positions under Relator. (Hawley Dep. at 97, Pl. Ex. 52 & 63.) The result of these interviews paralleled the existing complaints about Relator. (Pl. Ex. 52.) Hawley also asserts, and Kerr's memo states, that none of the interviewees had anything positive to say about Relator. (Hawley Dep. at 97-98, Pl. Ex. 63.) Relator admits that she met with Kerr and Hawley about the results of these interviews in late June 2010, and was told that her employees didn't trust her and were unhappy with her management style. (Salters Dep. at 153-54, Pl. Ex. 63.) According to Relator, Hawley and Kerr told her "to figure out if [she] thought [she] could correct the damage that had been done and to talk to

some of [her] coworkers to see if they could make suggestions." (Salters Dep. at 155.)

Relator was told at the late June meeting that AFC had not made a final decision about her employment status, but she was warned that she could be terminated. (Pl. Ex. 63.) Hawley asserts that Relator was told not to discipline or retaliate against any of her employees before management made a final decision. (*Id.*, Hawley Dec. ¶ 16.) According to Hawley, he was concerned that AFC would get sued because Relator had created a hostile work environment. (Hawley Dep. at 93-94, Hawley Dec. ¶ 16.)

Relator also admits that she spoke to some of her staff after her meeting with Hawley and Kerr, and that they said "that they felt like [she] had micromanaged and [she] wasn't giving them a chance to make suggestions and corrections." (*Id.*) They also told Relator that they did not trust her, and that they felt like she did not listen to them. (*Id.* at 157-58.) Relator alleges that that one employee told her that she "she knew that [Relator] didn't mean to hurt anybody." (Salters Dep. at 159.) Some of the employees she spoke to, however, allege that Relator tried to "get information from [her] as to who may have complained." (Woodfin Dec. ¶ 8, Allen Dec. ¶ 14.) A termination memo created on July

2, 2010 and placed in Salter's employment folder contends that two employees complained that Relator had criticized and attempted to retaliate against those who she thought might have reported her to management. (Pl. Ex. 63.)

The Memo sets out that based on this behavior, Kerr informed Hawley that "the situation was not salvageable and that [Relator] should be terminated." (*Id*.) Hawley then made the decision to terminate Relator, purportedly because "of the way she treated her subordinates . . . her loss of respect and trust . . . her failure to delegate work and train . . . and because she attempted to find out who had complained." (Hawley Dec. ¶ 18.) However, Irwin and Johansen also were involved in this decision. (Kerr Dep. at 114.) Relator was then terminated by Kerr and Hawley on June 30, 2010. (Salters Dep. at 14 & 161.)

Relator insists that AFC did not follow the proper procedures for discipline and termination as set forth in the Employee Handbook. (Pl. Ex. 95.) The Handbook provides for progressive discipline, including a written warning for a first offense, suspension for another offense, and termination for a third offense. (*Id*. at 15.) Yet, the Handbook also states that "[t]here may be circumstances when one or more steps are bypassed or repeated." (*Id*. at 14.) Relator points out that Pickens was disciplined

while working at AFC through "employee counseling" and a written warning. (Pl. Ex. 97) A record of this discipline was placed in Pickens's file, along with her response to the warning[3]. (*Id.*) Pickens also testified that she received another warning for tardiness. (Pickens Dep. at 102-03.)

Relator also avers that Hawley never conducted an annual review of her work, which was required by the Employee Handbook, and that such reviews were regularly conducted with Pickens. (Pl. Ex. 95 at 36.) While Pickens's file contained records of these annual reviews, Relator's had none. Relator's file also contained only one unrelated record of misconduct, and contained evidence of a promotion and three raises. (Pl. Ex. 60.) There was no evidence of complaints about Relator's behavior in her file until after she engaged in the protected activity. (*Id.*) Even after her termination, the only documents in her file that list these supposed complaints are dated July 2, 2010.[4] Relator also professes that she never met with Hawley or Kerr to discuss her job performance until late June,

---

[3] The document presented is unclear, but appears to address concerns that Pickens was disorganized and was not properly completing her duties (e.g. receipts were not being written, copays were not being collected).

[4] Relator's file contains the following disciplinary documents: an unrelated memorandum dated March 7, 2008, a termination memorandum by Hawley dated July 2, 2010, a termination memorandum by Kerr dated July 2, 2010, and a report titled March Meeting by Hawley dated July 2, 2010. (Pl. Ex. 60.)

and was unaware that any problems existed before that meeting. (Salters Dec. at 151-53.)

### B. Allegations of Improper Billing

Throughout her tenure at AFC, Relator repeatedly brought issues with the company's billing practices to her supervisor's attention.[5] (Salters Dep. at 67, 189, 191-94, 200-01.) For example, in 2007 Relator emailed Birmingham Clinical Director Kay Park ("Park"), raising a problem with billing for follow-up visits that should have been included in global surgery and laceration periods. (Pl. Ex. 107 & 108.) Relator claims that Hawley had instructed her to contact Park if she had any questions. (Salters Dep. at 194.) Also in 2007, Relator purportedly scheduled an appointment with Irwin to discuss a supposed lack of proper documentation by doctors. (Salters Dep. at 25-26.) She states that when she raised these concerns, Irwin was "stern" and told her that doctors were responsible for their own documentation, and that billing would be done "his way." (Salters Dep. at 25-29.)

Relator also avers that in 2008, when one of AFC's doctors lost his privileges for upcoding, Irwin made her re-audit charts that Blue Cross Blue Shield had audited and asked her to come up with a conclusion that

---

[5] A separate summary judgment motion will be filed as to the fraud and improper billing claims in this case. Therefore, they will not be addressed in this opinion.

differed from Blue Cross Blue Shield's. (Salters Dep. 20-30.) When Relator reached the same result as Blue Cross Blue Shield, Relator reports that Irwin "curse[d] [her] and was very blatantly ugly to [her]." (Salters Dep. 30.) Relator also allegedly reported concerns to Park about billing for ultrasounds in the Vestavia clinic and sent an email to her supervisors expressing concern that AFC had improperly billed for after-hours visits that took place during its normal business hours. (Pl. Ex. 26 & 114.) According to Relator, the issue was then corrected and AFC stopped this billing practice. (Salters Dep. at 189). Relator purportedly spoke to Johansen, Hawley and Irwin when she thought that AFC was improperly billing for administration and injection codes and this practice was corrected after the report. (Salters Dep. at 199-201). In March 2010, Relator also expressed concern that unbundling was slowing down the speed of processing payments. (Salters Dep. at 59-60.)

However, Relator alleges that the protected activity in this case was a complaint she made regarding potential Stark Law violations. She met with Johansen, Park, and Hawley in March 2010 to voice her concerns that paying Dr. McCoy for lab referrals to AFC violated the Stark Law. Johansen told her that he would take a look at this purported violation after she sent him some further information. (Salters Dep. at 53,

Johansen Dep. at 242-43).  On May 18, 2010, Relator sent an e-mail to Chief Operating Officer Tom Lazenby, Johansen, Park, and Hawley with a detailed explanation of why she thought the Stark Law had been violated and attached a copy of the statute to her e-mail. (Salters Dep. at 54-55, Johansen Dep. at 242, Pl. Ex. 18.)

Relator claims that no one responded to her concern about the violation. (Salters Dep. at 65.) However, Johansen claims that he did speak to Relator about the problems she raised in her email. (Johansen Dep. at 244-45.) Johansen also testified that he discussed the issue with Hawley, and that they came to the conclusion that there was no improper billing occurring. (*Id.* at 246-47.) Further, Kerr says he had no knowledge of the alleged protected activity when he recommended that Relator be terminated in late June 2010, six weeks after the e-mail was sent. (Kerr Dep. at 75-6.) Yet, it is undisputed that Hawley, who made the final decision to terminate Relator, was aware of the protected activity when he made that decision. (Kerr Dep. at 78, Pl. Ex. 18.) Relator was terminated on June 30, 2010 and filed this action on October 20, 2010.

### C. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).  A material fact is one that "might affect the outcome of the case." *Urquilla-Diaz v. Kaplan Univ.*, 780 F. 3d 1039, 1049 (11th Cir. 2015).  A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* The trial judge should not weigh the evidence, but determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "considering all of the evidence and the inferences it may yield in the light most favorable to the nonmoving party." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (citing *Ellis v. England*, 432 F.3d 1321, 1325 (11th Cir. 2005)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *Id.* Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored

procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

### D. Discussion

Relator brings a retaliation claim against AFC pursuant to the whistleblower provision of the FCA.  She contends that she was fired because she complained that AFC had violated Medicare regulations in how it billed for medical services. Specifically, she was concerned that AFC was billing for laboratory tests ordered by Dr. McCoy while he was not actually present at the clinic.

The whistleblower provision of the FCA provides protection for those who report violations of the statute.  31 U.S.C § 3720(h).  Specifically, it provides relief to an employee who was "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . .  in furtherance of an action under this section or to stop . . . violations of this subchapter." 31 U.S.C. § 3730(h)(1).

While the Eleventh Circuit has not yet ruled on the applicable standard for finding retaliation in violation of the FCA, the Fifth Circuit and other circuits have found that the *McDonnell Douglas* framework is applicable to these actions. *McDonnell Douglas* v. Green, 411 U.S. 792, 802 (1973);

*see, e.g.*, *Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 175 & n.3 (5th Cir. 2016), *Elkharwily v. Mayo Holding Co.*, 823 F.3d 462, 470 (8th Cir. 2016), *Harrington v. Aggregate Indus. Ne. Region*, *Inc.*, 668 F.3d 25, 31 (1st Cir. 2012). In order to bring a successful claim, a plaintiff must first establish a prima facie case by showing "(1) that [s]he engaged in protected activity, (2) that [s]he suffered an adverse employment action, and (3) 'that a causal link existed between the protected activity and the adverse action.'" *Diaz*, 820 F.3d at 176 (quoting *Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d 822, 827 (5th Cir. 2015)).

An internal complaint to a supervisor qualifies as a protected activity if that complaint "allege[s] fraud on the government." *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010) (quoting *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 516 (6th Cir. 2000)). An internal complaint sufficiently alleges fraud if the allegations "are sufficient to support a reasonable conclusion that the employer could have feared being reported to the government . . . or sued in a *qui tam* action." *Id*. In this case, Relator emailed AFC's president, detailing her concerns about AFC's possible violation of the Stark Law. That claimed violation would entitle Relator to file a *qui tam* action against AFC, as indeed she did after her termination. 42 U.S.C. §

Page 17 of 25

1395nn. Therefore, Relator has shown that she engaged in a protected activity. Relator has also shown that AFC terminated her, which qualifies as an adverse employment action. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). Therefore, Relator has shown the first two elements of a *prima facie* case for retaliation, and the only element at issue is causation.

In order to demonstrate causation, a plaintiff "merely has to prove that the protected activity and the negative employment action are not completely unrelated." *E.E.O.C. v. Reichhold Chems., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993).   This means that she "must at least establish that the employer was actually aware of the protected expression at the time the employer took adverse employment action against the plaintiff." *Holifield v. Reno,* 115 F.3d 1555, 1566 (11th Cir. 1997)*.* Close temporal proximity can also be effective to raise an inference of causation, but if this is the only basis of causation, the actions must be very close in time. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).   In fact, the Eleventh Circuit held that a period of three or four months is too long. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)*.* However, the Eleventh Circuit has found

that seven weeks is "sufficiently proximate to create a causal nexus." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999).

In the present case, Relator can establish that Hawley, who made the ultimate decision to fire her, knew about the protected activity because he was one of the recipients of her May 18, 2010 e-mail. (Pl. Ex. 18.) However, Kerr, who recommended that Hawley fire Salters, testified that he had no knowledge of the e-mail and he was not one of its recipients. (Kerr Dep. at 75-76.) Therefore, Relator can only establish awareness of the protected action for one of the individuals involved in her termination. However, as the individual with awareness was the one who ultimately made the decision to dismiss Relator, this is presumably enough for a *prima facie* case of retaliation, especially when coupled with the fact that Relator was fired just six weeks after her protected activity.

As Salters has established a *prima facie* case of retaliation, the burden shifts to AFC to "articulate some legitimate, nondiscriminatory reason" for the adverse employment decision. *McDonnell Douglas Corp.,* 411 U.S. at 802.  Once AFC meets this burden, it is up to Relator to show that the reasons given are a pretext for illegal retaliation. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981).  An employee can do this

"either directly by persuading the court that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256. However, "[p]rovided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on, and rebut it, and that employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).

In this case, AFC has offered a legitimate nonretaliatory reason for terminating Relator. AFC claims that Relator was fired because of her poor management skills, the poor work environment she created in the CPC, and ultimately her inability to acknowledge the situation and make meaningful changes to the way she managed the CPC. AFC supports this claim with a significant amount of evidence, mainly in the form of testimony of those who worked with Relator and reported that they felt threatened by her management style and did not think she was good at her job.

The burden thus shifts to Relator to present evidence that would lead a reasonable jury to conclude that the proferred legitimate reason is either outweighed by a retaliatory reason, or not worthy of belief.

*Burdine*, 450 U.S. at 256. First, Relator argues that she could not have been fired for her poor job performance because her employment file does not reflect AFC's purported assessment of her behavior. According to Relator, since her employment file does not contain any records of discipline or even any negative evaluations, but instead only contains records of promotions and bonuses, she could not have been fired for her unsatisfactory performance.

She also provides evidence that one other employee (Pickens) was disciplined and subjected to corrective action, which was documented in her file. Even though Relator does provide evidence that discipline forms and established AFC discipline procedures existed, the Employee Handbook also clearly states that these disciplinary procedures did not have to be followed in all cases. Further Pickens was not similarly situated to Relator. Pickens did not hold the same position, and further, there is no allegation that she engaged in similar misconduct. For example, one of AFC's complaints about Pickens was tardiness, which is not similar to AFC's complaints about Relator. Thus, the lack of negative material in Relator's file does not show that AFC's proferred reasons for terminating her are pretextual.

Relator also cites to an opinion from the U.S. District Court for the Middle District of Alabama for the proposition that she need only show that "the negative treatment she suffered was motivated *at least in part* by retaliation." *Mann v. Olsten Certified Healthcare Corp.*, 49 F. Supp. 2d 1307, 1316 (M.D. Ala. 1999) (emphasis added). However, that is not the applicable standard in this case. The *McDonnell Douglas* standard requires that the employee show that the employer's proferred legitimate reason was pretextual. *Burdine*, 450 U.S. at 248. An employee who fails to show pretext will not meet her burden under *McDonnell Douglas*, even if she raises possible retalitatory reasons for the employment action. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-16 (1993) (quoting *Burdine*, 450 U.S. at 253) ("a reason cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason") (emphasis in original).

Further, Relator herself testified that she asked other employees about her performance after the issues were brought to her attention in June 2010, and they confirmed that there were problems with her management style.  They told her that they did not trust her and felt that she would not listen to them.  Therefore, Relator's own testimony

confirmed that she could reasonably have been terminated because numerous employees had expressed genuine issues with her management of the CPC.

Relator does not argue that she did not have management style problems or that she did not do the things that AFC lists as reasons for her termination. Instead, she alleges that she was unaware of these problems until she met with Kerr and Hawley in late June 2010, and that she was never given an opportunity to correct her management style problems, because she was terminated almost immediately following the meeting. AFC does not dispute that she did not have the chance to make changes, but claims that management chose to fire her straightaway because after the meeting, she attempted to retaliate against other employees. Relator disputes that her conversations after the meeting were retaliatory, claiming instead that they were attempts to learn how to fix her management problems. After all, Relator was directed by Hawley and Kerr to "talk to some . . . coworkers to see if they could make suggestions." (Salters Dep. at 155.) Relator claims that in speaking to her co-workers, she was simply following these direct instructions, but that AFC used this very compliance as a pretext to terminate her.

AFC's own June 11 memorandum about Relator's conduct provides further evidence of pretext. This memorandum by Kerr, who did not know about Relator's protected activity, recommended that Relator be demoted and allowed to improve her performance. It did not suggest immediate termination. Yet, between June 11 and June 30, Hawley—who knew about Relator's protected activity—decided to terminate Relator without this demotion or opportunity for improvement. Kerr's July 2 termination memorandum claims that he told Hawley to fire Relator. However, this memorandum was not created until after the termination occurred, and AFC does not dispute that Hawley made the ultimate decision. These circumstances raise a jury question on the issue of pretext.

AFC has provided ample evidence of a possible legitimate reason for the termination. However, "the district court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). If a nonmoving party—such as Relator in this case—"set[s] forth specific facts showing that there is a genuine issue for trial" such that "a jury [could] return a verdict for that party," summary judgment cannot be granted.

Page 24 of 25

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1956) (quoting Fed. R. Civ. P. 56). The Court cannot, at summary judgment "weigh the evidence and determine the truth of the matter." *Id.* at 249. A jury could find that Relator's quick termination with no opportunity to improve her conduct and no gradual discipline is evidence of pretext. Therefore, summary judgment as to Relator's retaliation claim is due to be denied.

### E. Conclusion

For the reasons stated above, Defendant's motion for partial summary judgment is due to be DENIED. A separate order consistent with this opinion will be entered.

**DONE** and **ORDERED** this 15th day of December 2016.

L. Scott Coogler
United States District Judge

186291